# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| UPPER MISSOURI WATERKEEPER,<br><br>　　　　　　　　Plaintiff,<br><br>vs.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and ANDREW WHEELER, Administrator, United States Environmental Protection Agency<br><br>　　　　　　　　Defendants,<br><br>STATE OF MONTANA DEPARTMENT OF ENVIRONMENTAL QUALITY, TREASURE STATE RESOURCES ASSOCIATION OF MONTANA, and MONTANA LEAGUE OF CITIES AND TOWNS,<br><br>　　　　Defendants and Intervenors. | **CV-16-52-GF-BMM**<br>**CV-20-27-GF-BMM**<br><br>**CONSOLIDATED ORDER** |

## INTRODUCTION

Plaintiff Upper Missouri Waterkeeper ("Waterkeeper") filed this action to challenge the Environmental Protection Agency's ("EPA") February 24, 2020 approval of A.R.M. §§ 17.30.619(2) and 17.30.715(4) (collectively "Poison Pill") as arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C.

§ 706(2)(A), and unlawful under the Clean Water Act ("CWA") mandates as set forth in 33 U.S.C. § 1313. *Upper Missouri Waterkeeper v. U.S. Envtl. Protection Agency*, Cause No. CV-20-27, Doc. 1 (D. Mont. 2020) ("*Waterkeeper II*"). Waterkeeper filed a Motion for Summary Judgment on March 31, 2020. *Waterkeeper II*, Doc. 12.

Defendants EPA and Andrew Wheeler, EPA Administrator, and Defendant-Intervenors State of Montana Department of Environmental Quality ("DEQ"), Treasure State Resources Association of Montana, and Montana League of Cities and Towns (collectively, "Defendants"), have filed Cross-Motions for Summary Judgment to uphold EPA's approval of the Poison Pill. (Docs. 35, 39, 43, and 63). The Court held a hearing on the summary judgment motions on September 24, 2020.

The case arises from a substantially related earlier—and ongoing—legal controversy. *Upper Missouri Waterkeeper v. U.S. Envtl. Protection Agency, et al.*, 377 F. Supp. 3d 1156, Cause No. CV-16-52 (D. Mont. 2019) ("*Waterkeeper I*").

## STATUTORY AND REGULATORY BACKGROUND

### *The Clean Water Act and WQS Criteria Development*

"The Clean Water Act anticipates a partnership between the States and the Federal Government, animated by a shared objective: 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992) (quoting 33 U.S.C. § 1251(a)). A core element

of the CWA involves a two-step approach to improving water quality that "delegates certain responsibilities to EPA and others to the States in furtherance of the [CWA]'s stated purpose of promoting cooperation between federal and state governments." *Anacostia Riverkeeper, Inc. v. Jackson*, 798 F. Supp. 2d 210, 214 (D.D.C. 2011) (citing 33 U.S.C. § 1251(b)).

In the first step, Congress provided states the opportunity to develop water quality standards ("WQS") "to protect public health or welfare, enhance the quality of water and serve" the CWA's stated goal to "restore and maintain" the Nation's waters. 40 C.F.R. § 131.2; *see also* 33 U.S.C. §§ 1251, 1313. A state that seeks to promulgate WQS must follow these steps: (1) identify designated uses of its waters, 40 C.F.R. § 131.10; (2) develop WQS criteria necessary to protect those designated uses, 40 C.F.R. § 131.11(a)(1); and (3) adopt an antidegradation review policy that allows the state to assess activities that may lower the water quality of a water body, 40 C.F.R. § 131.12. *See Pennaco Energy, Inc. v. U.S. Envtl. Protection Agency*, 692 F. Supp. 2d 1297, 1300-01 (D. Wyo. 2009).

A state must establish WQS criteria on "sound scientific rationale and must [include] sufficient parameters or constituents to protect the designated use." 40 C.F.R. § 131.11(a)(1). A state may establish WQS criteria in one of two forms: numeric or narrative criteria. 40 C.F.R. § 131.11(b). Numeric criteria represent quantifiable concentration levels of nutrient pollutants that can be present in a

waterbody while still protecting the designated uses of that waterbody. EPA, *Nutrient Criteria Technical Guidance Manual: Rivers and Streams* (July 2000), *Waterkeeper II*, Doc. 19 at 26 ("EPA Nutrient Guidance"). Narrative criteria arise from "verbal expressions of desired water quality conditions that are meant to describe the unimpaired condition of a waterbody." *Id.*

A state also may include variances in their proposed WQS. 40 C.F.R. §§ 131.5(a)(4), 131.13. A WQS variance allows a state to improve water quality in stages over a specified time period at locations that cannot yet meet the base WQS criteria. 40 C.F.R. § 131.3(o). These WQS variances remain subject to the same review standards and procedures as the WQS criteria. 33 U.S.C. § 1313(c); 40 C.F.R. § 131.14. Proposed WQS variances, like base WQS criteria, constitute part of a state's overall WQS package. *See* 40 C.F.R. §§ 131.13; 131.14.

Congress directed a state to submit its WQS package to EPA in the second step of WQS development for a round of cooperative review and development. EPA reviews whether the components of a state's proposed WQS package "meet[] the requirements" of the CWA.  33 U.S.C. § 1313(c)(3); *Sanitary Bd. of City of Charleston, W.V. v. Wheeler*, 918 F.3d 324, 331 (4th Cir. 2019).

The CWA provides two possible outcomes for EPA review of a state's proposed WQS package. *See* 33 U.S.C. § 1313(c)(3). EPA may approve the proposal within 60 days of submission. *Id.* EPA's approval of a state's proposed WQS

4

transforms the proposal into the state's "applicable [WQS] for purposes of the Act." 40 C.F.R. § 131.21(c)(2). EPA alternatively may notify the state of the proposal's noncompliance with the CWA within 90 days of submission. 33 U.S.C. § 1313(c)(3). EPA's notice of noncompliance of a state's proposed WQS with the CWA does not result in the proposal's termination. *See id*. At that point, EPA must explain the proposal's deficiencies and specify changes needed to make the proposal consistent with the CWA's requirements. *Id.*; 40 C.F.R. §131.21(a)(2). Congress designed this stage to encourage active engagement between EPA and the state in an effort to avoid federalization of the CWA.

A state has 90 days from notification of noncompliance with the CWA to accept the changes specified by EPA. 33 U.S.C. § 1313(c)(3). Should the state fail to accept the specified changes, the CWA requires EPA to step in and "promptly prepare and publish proposed regulations setting forth a revised or new [WQS] for the navigable waters involved." *Id.* § 1313(c)(3), (4). EPA must adopt this proposed regulation as the state's new or revised WQS within 90 days from publication, unless the state submits a new or revised WQS in the interim that EPA deems consistent with the CWA's requirements. *Id.* § 1313(c)(4). EPA's notice of noncompliance triggers a process of engagement between EPA and the state. This engagement process continues until the parties reconcile the state's proposal with the

requirements of the CWA, or until EPA itself promulgates WQS for the navigable

waters involved. *See id.* § 1313(c)(3), (4).

## FACTUAL BACKGROUND

*Montana's Development of Base Numeric Nutrient WQS and
General Variance WQS*

EPA regulations direct states to establish numeric nutrient criteria. 40 C.F.R.

§ 131.11(b)(1). EPA regulations allow for adoption of narrative nutrient criteria only

"where numerical criteria cannot be established or to supplement numerical criteria."

40 C.F.R. § 131.11(b)(2). In fact, EPA touts the development of numeric nutrient

criteria as "more useful than narrative criteria in a number of ways." EPA Nutrient

Guidance, *Waterkeeper II*, Doc. 19 at 27. EPA's guidance states, for example, that

"[t]he lack of numeric criteria makes it difficult to assess the condition of rivers and

streams and develop [WQS]." *Id.*

Montana became a national leader in the development of numeric nutrient

criteria WQS when it adopted and EPA approved stringent base numeric nutrient

WQS criteria ("base numeric nutrient WQS") in 2015. Montana included a general

variance WQS from its base numeric nutrient WQS to provide a twenty-year period

of relaxed criteria for certain dischargers. Montana also included in its submission

to EPA two amendments to A.R.M. §§ 17.30.619(2) and 17.30.715(4)—the Poison

Pill—in anticipation of Montana's adoption of a WQS package. The "self-

executing" Poison Pill would void the base numeric nutrient WQS automatically

6

upon occurrence of one of three triggering events: (1) a court invalidates the general variance WQS; (2) EPA disapproves the general variance WQS; or (3) the general variance WQS otherwise is not available. A.R.M. §§ 17.30.619(2), 17.30.715(4). The Poison Pill would invalidate the base numeric nutrient WQS and return Montana to less restrictive narrative criteria.

The Montana Board of Environmental Review ("BER") adopted the Poison Pill to ensure implementation of *both* the stringent base numeric nutrient WQS *and* the general variance WQS. *See* 3 Mont. Admin. Reg. 280, 286-87, 293-94 (Feb. 13, 2014) ("The Legislature intended that variances be available to permittees once base numeric nutrient [WQS] were adopted and both pieces (base numeric [nutrient WQS] and variances) must remain together as a package."). BER and DEQ did not want EPA to approve only the stringent base numeric nutrient WQS due to the inability of certain waters to achieve those WQS without time to adapt.

EPA approved the base numeric nutrient WQS and the general variance WQS in February 2015. Rationale for the EPA's Action on Montana's New and Revised Water Quality Standards, EPA, (Feb. 26, 2015), *Waterkeeper II*, Doc. 19 at 35 ("2015 EPA Decision and Rationale Letter"). EPA declined to act on the Poison Pill. *Id.*, Doc. 19 at 41. EPA deemed it "*inadvisable* for [Montana] to include such a provision" in its proposed WQS package. *Id.* (emphasis added). EPA based its rationale on its continued commitment to "collaboration with the state to implement

7

th[e] nutrient rule approach consistent with CWA requirements, including the adoption of variances." *Id.* This cooperative relationship between EPA and the State rendered the Poison Pill unnecessary as part of Montana's WQS package. *Id.* EPA's inadvisability finding reinforced the CWA's cooperative federalism framework. *See* 33 U.S.C. § 1313(c).

EPA regulations clarify that proposed WQS submitted to EPA do not become "applicable [WQS]" for purposes of the CWA until EPA approves the WQS. 40 C.F.R. § 131.21 (citing 33 U.S.C. § 1313(c)). The Poison Pill never took effect as a CWA standard because EPA never approved it as part of Montana's WQS package in 2015. *See Alaska Clean Water All. v. Clarke*, 1997 WL 446499, at *3 (W.D. Wash. 1997) ("Congress did not intend new or revised state [WQS] to be effective until after EPA had reviewed and approved them.").

### Waterkeeper I

Waterkeeper challenged EPA's approval of Montana's general variance WQS, and as amended general variance WQS adopted during the first litigation. The Court determined that the general variance timelines violated the CWA because they provided a "seventeen-year timeline to allow dischargers to meet the relaxed" general variance WQS. 2019 Summary Judgment Order, *Waterkeeper I*, Doc. 177 at 32. The general variance timelines, as approved by EPA, provided Montana dischargers with a variance that would "avoid attainment indefinitely rather than

8

. . . make progress toward attainment" of the stringent base numeric nutrient WQS. *Id.* at 31.

The Court's 2019 Summary Judgment Order directed Defendants to undertake the following corrective action: (1) "begin with a program that complies with the relaxed criteria" of the general variance WQS; (2) "work toward ultimate attainment of Montana's Base [numeric nutrient] WQS in order to demonstrate progress toward attainment"; and (3) "adopt a timeline for which attainment of Montana's Base [numeric nutrient] WQS would be feasible." *Id.*, at 29. The Court sought guidance from the parties "as to the timing and scope of the appropriate remedies to address the issues identified" in the Court's 2019 Summary Judgment Order. *Id.* The Court considered in its 2019 Remedies Order the additional briefs submitted by the parties. 2019 Remedy Order, *Waterkeeper I*, Doc. 184.

Waterkeeper's preferred remedy asked the Court to impose two timelines on Defendants: a first to provide "a reasonable period of time for dischargers of nutrient pollutants to meet the highest attainable condition set forth in [the general variance WQS]"; and a second to provide "a reasonable period of time for dischargers of nutrient pollutants to meet the [base numeric nutrient WQS], necessary to protect designated uses of Montana waters." *Waterkeeper I*, Doc. 180 at 2.

DEQ asked the Court to stay its order of vacatur of the timeline portion of EPA's approval of the general variance WQS "until such time as EPA approves a

replacement general variance [timeline], amended to be consistent with the Court's [2019 Summary Judgment] Order." *Waterkeeper I*, Doc. 182 at 5. DEQ recognized the Order's limited reach to only the general variance WQS's timelines. *Id.* at 6 ("The error recognized by the Court is limited primarily to the *term* of the [general] variance [WQS], and much of EPA's approval, including EPA's approval of the [general variance WQS] as the highest attainable condition, has been found to be reasonable." (emphasis added)). DEQ's request for a partial vacatur and an accompanying stay acknowledged the fact that "the revised general variance [WQS] itself [wa]s not 'irredeemable,' . . . but d[id] need certain changes to address the Court's concerns for facilities that do not currently meet" the general variance WQS. *Id.*

DEQ alerted the Court to the existence of the Poison Pill as a matter of state law in its remedies briefing. *Id.* at 2 fn. 1. DEQ noted that Montana adopted the 2017 amendments to the general variance WQS, in part, to avoid expiration of its general variance, given Montana's three-year review requirement. *Id.* DEQ argued that expiration of the original general variance WQS would have triggered the Poison Pill. *Id.* DEQ's fear of triggering the Poison Pill was misplaced given EPA's declination to approve the Poison Pill as a state WQS in 2015. *See* 2015 EPA Decision and Rationale Letter, *Waterkeeper II*, Doc. 19 at 41.

10

EPA's preferred remedy involved a remand without vacatur of the portion of the general variance WQS approval that addressed the variance's timelines. *Waterkeeper I*, Doc. 181 at 3. EPA requested that the Court limit its remand to the portion of EPA's approval of the general variance WQS—the timelines—that the Court determined to be unlawful. *Id.* at 8. EPA alternatively argued, if the Court chose to remand with vacatur, that the Court should stay the vacatur to allow DEQ and EPA to address the Court's findings. *Id.* at 3.

The Court outlined directions for Defendants to remedy the general variance timelines error in a subsequent order issued July 16, 2019. 2019 Remedies Order, *Waterkeeper I*, Doc. 184. The Court took into account the respective parties' positions and ordered a partial vacatur of the general variance timelines. *Id*. at 6. The Court was careful not to void the entire general variance WQS scheme adopted by DEQ and EPA. *Id.* at 5. The Court instead only partially vacated a small subsection of the general variance WQS, the portion conveying timelines. *Id.* The Court even stayed the partial vacatur "until EPA *approves a replacement general variance*." *Id.* at 6 (emphasis added). The Court provided DEQ with 120 days to complete the state rulemaking process, and EPA 90 days to complete its review of DEQ's proposal. *Id.* The Court intended for this remedy to build upon the CWA's cooperative federalism framework.

*EPA's February 24, 2020 Action*

DEQ conducted rulemaking following the Court's 2019 Remedies Order. DEQ submitted its revisions to the general variance timelines to EPA for approval on November 26, 2019. DEQ's submission to EPA included the following: (1) a copy of the adopted revised general variance timelines and supporting documentation; (2) notice of final adoption of the general variance timeline rules with the state's response to public comments; and (3) a letter certifying that the changes were adopted in accordance with state law. Letter from Gregory Sopkin, EPA Regional Administrator, to Shaun McGrath, DEQ Director (Feb. 24, 2020), *Waterkeeper II*, Doc. 18 at 5 ("2020 EPA Decision and Rationale Letter"). Nothing in the record indicates that DEQ resubmitted to EPA its 2014 proposed Poison Pill. EPA previously had declined to act on the Poison Pill as a part of Montana's WQS package. *See* 2015 EPA Decision and Rationale Letter, *Waterkeeper II*, Doc. 19 at 41.

EPA "disapproved" DEQ's submission on February 24, 2020. 2020 EPA Decision and Rationale Letter, *Waterkeeper II*, Doc. 18 at 5. EPA justified its decision by citing a lack of compliance with this Court's Orders. *Id.* at 12-13. EPA failed to provide DEQ with specific recommendations to cure defects or explain the statutorily mandated schedule for review and ultimate approval of general variance timelines. *Id.*; *see also* 33 U.S.C. § 1313(c)(3), (4). And EPA failed to clarify how

best to reconcile DEQ's needs with the requirements of the CWA. 2020 EPA Decision and Rationale Letter, *Waterkeeper II*, Doc. 18 at 12-13; 33 U.S.C. § 1313(c)(3), (4).

EPA instead provided a terse, and contradictory, single-paragraph "Specification of Necessary Changes." 2020 EPA Decision and Rationale Letter, *Waterkeeper II*, Doc. 18 at 12-13. EPA asserted in one sentence that "there are no changes that the EPA must specify to meet the requirements of the Act when disapproving a WQS variance." *Id.* at 13. EPA nonetheless provided a purported specification in the very next sentence. *Id.* EPA quoted this Court's 2019 Remedies Order and advised DEQ that, "to meet the CWA requirements as interpreted in the court's orders, the state must adopt 'a reasonable timeline that begins with the relaxed criteria of the [general] Variance Standard and leads to compliance with [Montana's base numeric nutrient] WQS.'" *Id.* (quoting 2019 Remedies Order, *Waterkeeper I*, Doc. 184 at 5).

EPA also approved, unprompted, the Poison Pill from Montana's 2014 proposed WQS package. *Id.* at 14-15. EPA insisted that the Poison Pill "was lawful and permissible and that the [EPA] should have acted on these two provisions [in 2015]." *Id.* at 15. EPA clarified that it "expresses no view . . . as to the specific circumstances, including today's disapproval action, that could trigger [the Poison

Pill], or as to any additional state processes that might be required to effectuate such a change." *Id.*

DEQ viewed EPA's action as triggering the Poison Pill, despite EPA's disclaimer. *Waterkeeper II* Summ. J. Hr'g Tr., 30:20-23, Sept. 24, 2020, Doc. 71. DEQ construed the triggering of the Poison Pill as vacating Montana's base numeric nutrient WQS and general variance WQS and substituting the more relaxed narrative nutrient WQS criteria. *Id.*, 30:23–31:11. Waterkeeper filed this separate action to challenge EPA's approval of the Poison Pill. *Waterkeeper II*, Doc. 1.

## DISCUSSION

### I.   Whether EPA's February 2020 action lifted the stay of partial vacatur imposed by the Court's 2019 Remedies Order.

The Court inquired at the September 24, 2020 summary judgment hearing about the status of the stay of partial vacatur imposed by the Court's 2019 Remedies Order. *Waterkeeper II* Summ. J. Hr'g Tr., 10:13–23, 14:6–23, 33:12–21, Sept. 24, 2020, Doc. 71. EPA asserted that the parties' conduct following EPA's action on February 24, 2020, to disapprove DEQ's new submission indicated a shared assumption that the action effectively lifted the Court's stay of partial vacatur. *Id.* 22:6–20. EPA argued that "[a]s a practical matter," the stay is no longer in effect. *Id.* 22:14. DEQ and Waterkeeper appeared to agree and are operating under the assumption that the Court's partial vacatur and EPA's denial of DEQ's submission triggered the now-approved Poison Pill. *See id.* at 30:20–31:11.

14

The Court disagrees with the parties' assessment. The Court directed that its stay of partial vacatur of the general variance timelines would remain in place until EPA "*approves* a replacement general variance [timeline] in accordance with the Court's [2019 Summary Judgment] Order" in *Waterkeeper I* (Doc. 177). 2019 Remedies Order, *Waterkeeper I*, Doc. 184 at 6 (emphasis added). EPA has not yet approved replacement general variance timelines. The Court's stay of the partial vacatur remains in effect. The original general variance timelines at issue in *Waterkeeper I* will remain in place until the Court lifts the stay of the partial vacatur. Courts routinely provide federal agencies with the opportunity to comply with statutory requirements while maintaining the regulatory status quo. *See, e.g.*, *Nat. Res. Defense Council, Inc. v. U.S. Envtl. Protection Agency*, 2020 WL 5632410, at *2 (D.D.C. Sept. 21, 2020) (staying vacatur of EPA approval under a different part of the CWA to provide EPA with the opportunity to comply with statutorily mandated timeline).

When this Court drafted the 2019 Remedies Order, it sought to reinforce and emulate the cooperative federalism framework contemplated in the CWA. The Court stayed its partial vacatur "until EPA *approves* a replacement general variance [timeline] in accordance with the Court's [2019 Summary Judgment] Order." 2019 Remedies Order, *Waterkeeper I*, Doc. 184 at 6 (emphasis added). The Court based the language "until EPA *approves* a replacement general variance [timeline]" on

DEQ's proposed remedy terms, EPA's stated concerns about vacatur, and Waterkeeper's proposed timelines. *Id.* The Court included an approval schedule in the 2019 Remedies Order, stating, "DEQ shall be given 120 days to complete the state rulemaking process from the date of this Order. EPA shall be given 90 days *to complete its review* of DEQ's submission."  *Id.*, at 5-6 (emphasis added). The Court included a stay of the partial vacatur as a safety net, to remain in place until EPA approved replacement general variance timelines in accordance with CWA mandates. 33 U.S.C. § 1313(c)(3), (4).

EPA failed to uphold its end of the bargain. EPA did not follow through with its assurance that vacatur served "little purpose" when it approved the Poison Pill without prompting from DEQ. EPA's approval of the Poison Pill invalidated Montana's base numeric nutrient WQS and instead substituted a reversion to Montana's outdated narrative nutrient criteria. EPA has failed to comply in good faith with the CWA's statutory mandate and its own representations to the Court that partial vacatur would serve "little purpose" as "Montana likely will soon revise [the general variance] with amended timelines." *Waterkeeper I*, Doc. 181 at 16. EPA instead appears to have tried to use partial vacatur of the general variance timelines—even though stayed by the Court—to invalidate entirely Montana's base numeric nutrient WQS and general variance WQS.

The Court will not lift its stay until EPA and DEQ reach general variance timelines that meets the following CWA requirements: (1) begin with a program that complies with the relaxed criteria of the general variance WQS; (2) work toward ultimate attainment of Montana's stringent base numeric nutrient WQS in order to demonstrate progress toward attainment; and (3) adopt a timeline for which attainment of Montana's base numeric nutrient WQS would be feasible. 2019 Summary Judgment Order, *Waterkeeper I*, Doc. 177 at 29. The parties must follow the procedural directives of 33 U.S.C. § 1313(c) in promulgating the revisions to Montana's general variance timelines.

The Court will reset its schedule from the 2019 Remedies Order to run from the date of this Order. The parties must engage in a new round of rulemaking and review to comply with the Court's previous 2019 Orders (Docs. 177 and 184) and the requirements of the CWA. DEQ retains initial jurisdiction over the remand to develop revised general variance timelines. DEQ shall be given 120 days from the date of this Order to adopt revised general variance timelines that comply with the CWA. DEQ shall then submit to EPA its proposed general variance timelines as part of its WQS. EPA shall be given 90 days to complete its review of DEQ's submission. 33 U.S.C. § 1313(c).

## II.   Consolidation of Cases

Rule 42(a) of the Federal Rules of Civil Procedure permits a district court to consolidate related cases *sua sponte*. *Devlin v. Transp. Commc'ns Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999) (citing *In re Adams Apple, Inc.*, 829 F.2d 1484, 1487 (9th Cir. 1987)). Consolidation is acceptable when "actions before the court involve a common question of law or fact." Fed. R. Civ. P. 42(a). Courts should invoke Rule 42 to "expedite trial and eliminate unnecessary repetition and confusion." *Devlin*, 175 F.3d at 130 (quoting *Miller v. U.S. Postal Serv.*, 729 F.2d 1033, 1036 (5th Cir. 1984)).

*Waterkeeper I* (Cause No. CV-16-52) and *Waterkeeper II* (Cause No. CV-20-27) involve the same underlying facts, law, and parties. Pending before the Court in *Waterkeeper I* is the stay of the order of partial vacatur. 2019 Remedies Order, *Waterkeeper I*, Doc. 184 at 6. Pending before the Court in *Waterkeeper II* is Waterkeeper's Motion for Summary Judgment (Doc. 12), and Defendants' Cross-Motions for Summary Judgment (Docs. 35, 39, 43, and 63). The Court orders the consolidation of *Waterkeeper I* and *Waterkeeper II* to avoid unnecessary repetition and confusion.

## III.   Deferral of Ruling on Summary Judgment

Waterkeeper's Complaint in *Waterkeeper II* challenges EPA's approval of the Poison Pill. (Doc. 1). The parties apparently have operated under the assumption that

EPA's disapproval of Montana's revised general variance timelines in February 2020 triggered application of the Poison Pill. The Court disagrees. The Court's stay of its partial vacatur remained in effect. The as amended general variance timeline remains in place due to the Court's stay. No judgment by the Court—and no act by Defendants—automatically triggered operation of the Poison Pill.

The Court has yet to rule on the pending summary judgment motions regarding the legality of EPA's approval of the Poison Pill. The Court will continue to review the record before it. Significant evidence seems to demonstrate, however, that EPA may have acted arbitrarily and capriciously, as well as unlawfully under the CWA. EPA appears to have circumvented the CWA's procedures for WQS approval and failed to consider all appropriate factors when it approved the Poison Pill. *See Motor Vehicles Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (holding that agency acted arbitrarily and capriciously when it failed to consider all appropriate factors before revoking seatbelt requirement from vehicle safety standard).

The Court temporarily defers ruling on the pending motions for summary judgment in *Waterkeeper II* (Docs. 12, 35, 39, 43, and 63). This Order serves primarily to clarify the existing state of the case. The Court will conduct additional review of the record before making a final ruling on the pending motions for summary judgment regarding EPA's approval of the Poison Pill.

# ORDER

Accordingly, **IT IS ORDERED:**

1.      *Waterkeeper I* (Cause No. CV-16-52) and *Waterkeeper II* (Cause No. CV-20-27) are **CONSOLIDATED.**

2.      This Order incorporates by reference the partial vacatur and stay imposed by the 2019 Remedies Order, *Waterkeeper I*, Doc. 184. The partial vacatur shall be **STAYED** until EPA approves replacement general variance timelines in accordance with this Court's 2019 Summary Judgment Order, *Waterkeeper I*, Doc. 177.

3.      The Court **DEFERS** ruling on the Motions for Summary Judgment (Docs. 12, 35, 39, 43, and 63) in *Waterkeeper II* until it completes additional record review.

Dated this 30th day of October, 2020.

Brian Morris, Chief District Judge
United States District Court